# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| ANDREW M. OBRIECHT, | |
| Plaintiff, | |
| v. | Case No. 10-CV-221-JPS |
| RICK RAEMISCH, | |
| WARDEN LARRY JENKINS, | |
| SCOT GALLIGAN, | |
| LT. PAMELA ZANK, | |
| HALEY PUCKER, | |
| CAPT. STEVEN HAFERMAN, | |
| SHARON WEAVER, | |
| CAPT. THIEDE, | |
| LT. CASEY, | |
| RON ERDMIER, | |
| MARY BLOCZYNSKI, | |
| KEBERLEIN, | |
| JAYNE HACKBARTH, | ORDER |
| ALFONSO GRAHAM, | |
| STEVEN SCHUELER, | |
| JANE DOE, JOHN DOES, | |
| TOM GOZINSKE, and | |
| ROSIE EICKHOFF, | |
| Defendants. | |

This matter is now before the court on the defendants' second motion for summary judgment and the plaintiff's cross-motion for summary judgment.

The plaintiff also filed a motion for leave to file a dual reply brief and brief in opposition to the defendants' motion for summary judgment. The plaintiff believes this is necessary due to defendants' hybrid response to the plaintiff's motion for summary judgment and brief in support of their own motion for summary judgment. As part of this motion, the plaintiff asks that

the defendants' brief be stricken because they did not request permission to combine their briefs before filing. This motion will be granted in part and denied in part. The court will not strike the defendants' brief, but it will consider the plaintiff's joint brief.

1.      SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2.    FACTUAL BACKGROUND[1]

The plaintiff, Andrew Obriecht, was incarcerated at Kettle Moraine Correctional Institution (KMCI) from December 8, 2006, until September 6, 2007.  The defendants are all employees of the Wisconsin Department of Corrections (DOC).

2.1    Plaintiff's Offender Complaints

The Inmate Complaint Review System (ICRS) is a process by which inmates in adult institutions can file offender complaints related to significant issues regarding rules, living conditions, and staff actions.  Inmates may submit offender complaints to the institution's inmate complaint examiner (ICE).

Defendant Hayley Pucker ("Pucker") was the ICE at KMCI during the time period relevant to this case.  In her capacity as the ICE at KMCI, Pucker was responsible for using her discretion in deciding the best method to determine the facts regarding an offender complaint, including personal interviews, telephone calls, and document review.  However, the processing of ICRS complaints related to the disciplinary process is limited to review of the record.

Defendant Warden Larry Jenkins ("Warden Jenkins") was involved in the ICRS at KMCI as the appropriate reviewing authority.  His review of offender complaints is based on the investigation and pertinent information gathered by the ICE.

On March 12, 2007, the ICE office at KMCI received a group offender complaint regarding staff smoking inside the unit.  The plaintiff was the

_____

[1] The facts are taken from the defendants' proposed findings of fact (Docket #60) and the plaintiff's sworn declaration (Docket #57).

group's spokesperson. Pucker reviewed the KMCI smoking policy, which designated staff smoking areas, some of which were inside buildings. She also was aware that the policy was being reviewed. On March 14, 2007, Pucker recommended dismissal of the complaint, and her recommendation was sent to Warden Jenkins as the appropriate reviewing authority. Warden Jenkins dismissed the complaint because he was aware the policy was being reviewed. Shortly thereafter, in April 2007, the revised smoking policy for staff was issued, and it prohibited staff from smoking anywhere inside the institution.

The ICE office at KMCI received another group offender complaint with the plaintiff as the spokesperson on March 23, 2007. This complaint addressed the rule that inmates are only allowed 25 embossed envelopes per week. Pucker reviewed the KMCI Inmate Handbook and discussed the rule with Warden Jenkins, who indicated that he would make an exception to this limitation if the inmate had a court order that required more than 25 mailings per week. On March 23, 2007, Pucker recommended dismissal of the group complaint, and her recommendation was sent to Warden Jenkins as the appropriate reviewing authority. Warden Jenkins dismissed the complaint because he believed that 25 embossed envelopes per week was adequate and a reasonable limit. He would have made an exception to the rule if the inmate had a court order that required more than 25 mailings per week, but he did not believe the plaintiff had such an order.

On June 4, 2007, the KMCI ICE office received a third group offender complaint for which the plaintiff was the group's spokesperson. This complaint objected to exposure to asbestos within the institution. Pucker contacted the Superintendent of Building and Grounds, and the Building and Grounds Supervisor. Based on the information Pucker received, she

recommended dismissal of the group complaint, and her recommendation was sent to Warden Jenkins as the appropriate reviewing authority. Warden Jenkins dismissed this complaint because Pucker's investigation revealed that the institution had taken steps to ensure no asbestos was in the common areas of the institution and that maintenance staff inspects, repairs, and encapsulates reported areas of damaged insulation as a precaution.

The plaintiff appealed each of these three decisions to defendant Tom Gozinske ("Gozinske"), the corrections complaint examiner (CCE) at the DOC. It was Gozinske's responsibility as CCE to conduct record reviews regarding appeals of complaints submitted by inmates and make recommendations to the DOC Secretary (or the Secretary's designee) based on those reviews. The DOC Secretary (or the Secretary's designee) has the ultimate authority to decide the appeals.

On March 20, 2007, Gozinske recommended dismissal of the appeal of the group complaint regarding staff smoking inside the units at KMCI. Gozinske recommended dismissal of the appeal of the group complaint regarding the embossed envelope limit on April 2, 2007. And on June 11, 2007, Gozinske recommended dismissal of the group complaint concerning inmates' exposure to asbestos at KMCI.

Defendant Rick Raemisch ("Raemisch") was the Deputy Secretary of the DOC during the relevant time period. The DOC Secretary delegated to Raemisch the responsibility for making decisions related to inmate appeals of ICRS offender complaints after recommendations were made by the CCE. In this capacity, Raemisch had the authority to accept the CCE recommendation and adopt it as the decision, adopt the CCE recommendation with modifications, reject the modifications and make a decision, or return the appeal to the CCE for further investigation. With

regard to each of the three group complaints discussed above, Raemisch dismissed the appeals because he believed the recommendations made by the CCE were appropriate and reasonable.

The remaining named defendants, Captain Scot Galligan, Lt. Pamela Zank, Security Director Steven Schueler, Captain Steven Haferman, Anthony Keberlein, Mary Bloczynski, Ronald Erdmeier, Lt. Ryon Casey, Captain Steve Thiede, Alfonso Graham, Jayne Hackbarth, Roselyn Eickhoff, and Sharon Weaver, had no personal knowledge of the plaintiff's group complaints filed under the ICRS. None of these defendants were contacted by Pucker during his investigation regarding the complaints.

### 2.2    Plaintiff's Conduct Report

The plaintiff sent unsolicited form pen pal letters to individuals in April and May 2007. The content of the letters was not inappropriate. Seven recipients of the letters requested no further contact, and the plaintiff signed forms acknowledging that. Defendants Thiede, Zank, Erdmeier, and Casey explained to the plaintiff that he could continue sending form pen pal letters to persons in the community without being subject to discipline as long as he did not send anything to the persons who requested no further contact. He did not send those persons anything else.

On June 8, 2007, Lt. Zank wrote Conduct Report Number 1824948 (the "Conduct Report"). She alleged that the plaintiff violated rules 303.36 (Misuse of state or federal property) and 303.48 (Unauthorized use of mail). Lt. Zank described the incident underlying the Conduct Report as follows:

> Inmate Obriecht has sent out numerous correspondence soliciting a pen pal. Several receivers of these correspondence called this facility upset and frightened that Inmate Obriecht had written them. Several of these calls came from worried parents as inmate Obriecht had written to their minor

daughters. Unwanted correspondence [forms] were completed and to the best of this writers knowledge Mr. Obriecht had not written those individuals again. A list of females, their addresses and ages was confiscated from inmate Obriecht. Inmate maintains the list and documents, do not write, RTS - return to sender as appropriate. Inmate Obriechts typewriter was confiscated and it appeared as though it had not been used in quite some time. Inmate Obriecht informed me that he had acquired the names of the girls he had written from supplement papers he had gotten from the library. The supplements highlighted area graduates. Inmate Obriecht provided me with one of the supplements while at his work station in the library. The other supplement I found in the work area of the library clerks. Inmate Obriecht admitted to me that he did type the correspondence (which he has sent to numerous females) in the library while he was working as a library clerk. Inmate Obriecht stated he would type the letters during his down time and did not see anything wrong with that. While the content of the letter is not offensive, many complaints have come from the women receiving the letters. Numerous staff have had to calm down very frightened and upset parents and then speak with inmate Obriecht regarding the unwanted correspondence issue. I have reviewed the posistion [sic] description for the library clerk nowhere does it allow for personal work while functioning as the library clerk. Furthermore inmate Obriecht did intimidate some of the females and their families by writing them and possessing their addresses, several calls from these families came into this facility and needed immediate attention as these families were frightened. Inmate Obriecht also had in his possession a hand written memo that he had copied from the memo in the trash, took it out, and copied it. The memo is addressed to All KMCI Staff. Inmate is not a staff member. based on the fact Inmate Obriecht typed these letters, while working as a library clerk, the letters were intimidating to several of the females that received them[,] I am charging inmate Obriecht with 303.36 mis use of state property and 303.48 Unauthorized use of the mail (7) and 303.47 Possession of contraband for his possession of the information contained in the memo from the Warden to all staff.

(Affidavit of Hayley Pucker, Exhibit 1004, pp. 1-2). Lt. Zank wrote the Conduct Report based solely upon the disciplinary rules set forth in Wisconsin Administrative Code Chapter DOC 303, and only after she conducted an investigation and believed that the violations occurred.

The KMCI Security Director (or the director's designee) is responsible for reviewing all conduct reports for the appropriateness of the alleged rule violations. The Security Director (or the director's designee) has the authority to dismiss a conduct report, or strike any rule violation, if the facts as stated on the conduct report do not support a finding of guilty of violating the rule. Defendant Captain Haferman was designated to review the Conduct Report. On June 11, 2007, Captain Haferman reviewed the Conduct Report and determined that it should proceed as a major offense under DOC 303.75. Captain Haferman made this decision because he believed that the plaintiff had been warned about the same or similar conduct as to the charge related to 303.48 (Unauthorized use of the mail), and it was his belief that the alleged violations created a risk of serious disruption at the institution and within the community.

In April and May 2007, the plaintiff received eight separate memoranda directing him not to contact particular citizens again. Lt. Zank became aware of the plaintiff's actions. She believed that the plaintiff had received orders from various security staff related to unwanted correspondence or contact from specific individuals. After the accumulation of eight no-contact orders, on or about June 8, 2007, Lt. Zank spoke to the plaintiff. He informed her that he had found the names of the girls to whom he had written in the KMCI Library, where the plaintiff worked as a library clerk. The plaintiff told Lt. Zank that he typed the personal letters and

correspondence to these young females using the typewriter in the library during down time while he was working.

Lt. Zank reviewed the Library Clerk position description, and it did not allow inmates to conduct personal work while functioning as a library clerk. Conversely, the plaintiff says the description does not prohibit inmates from doing personal work on the typewriter while working. He also avers that he had permission from his supervisor, Conrad Reedy, to use the KMCI typewriter to do his personal work while working as a law clerk.

Lt. Zank acted solely in her capacity as a supervising officer and did not act in concert with any other staff. She did not take any joint action with any other staff in determining the appropriateness of writing the Conduct Report. At no time did she discuss with anyone, including any of the named defendants in this action, prior complaints filed by the plaintiff as a basis for this Conduct Report. She was not aware of any such complaints. Therefore, the complaints were not a factor in her decision to write the Conduct Report.

Defendants Captain Thiede, Lt. Casey, and Mr. Erdmeier had no personal involvement related to the Conduct Report. Nor did they have any personal involvement related to the disciplinary process, including the decision and disposition, related to the Conduct Report. However, these defendants were involved in investigating the citizen complaints against the plaintiff. Each of these defendants spoke to the plaintiff about the letters he was writing. The plaintiff maintains that each of them told him he could continue to send unsolicited pen pal requests to persons in the community without being disciplined.

### 2.3    Plaintiff's Disciplinary Hearing Preparation

On June 11, 2007, the plaintiff received a copy of the Conduct Report. He was also given a copy of form DOC-71, which was his notice of his rights

related to a disciplinary hearing. On form DOC-71, the plaintiff was advised that defendant Sharon Weaver ("Weaver") was his advocate related to the disciplinary hearing process.

At each correctional institution, the warden may designate staff members to serve as advocates for inmates in disciplinary hearings at the institution. The assigned advocate must have no conflict of interest related to the inmate or the incident which is the subject of the alleged rule violations. When the warden assigns an advocate, the advocate helps the inmate understand the charges against him and helps in the preparation and presentation of any inmate defenses, including gathering evidence and testimony and assisting in the preparation of the inmate's statement.

An inmate who receives a conduct report that is deemed to be a major offense may, directly or through an advocate, make a request to the security office for witnesses to appear at the disciplinary hearing, including requests for the appearance of the staff member who signed the conduct report. Except for good cause, an inmate may not present more than two witnesses in addition to the reporting staff member or members. Ordinarily, the right to present evidence is basic to a fair hearing, but the unrestricted right to call witnesses from the prison population and/or staff carries a potential for disruption or for interference with the swift punishment that in individual cases may be essential to carrying out the correctional programs of the institution. Prison officials have discretion to keep the hearing within reasonable limits and to refuse witnesses with proper justification, consistent with DOC 303.

Defendant Steven Schueler ("Schueler"), the Security Director at KMCI, was responsible for reviewing inmate requests for witnesses at disciplinary hearings and determining whether requested witnesses possess

relevant information and should be called at the disciplinary hearing. Witnesses who are requested by the inmate who are staff or inmates shall attend the disciplinary hearing unless there is a risk of harm to the witness if the witness testifies, the testimony is irrelevant to the question of guilt or innocence, or the testimony is cumulative of other evidence or would unduly prolong the hearing.

The plaintiff asked Weaver to help him: (1) call staff witnesses Zank, Erdmeier, Casey, Thiede, and Reedy; and (2) obtain witness testimony and report said testimony to the hearing officer from outside witnesses, the persons in the community who received the plaintiff's form pen pal requests and asked for no further contact.

On or about June 12, 2007, Weaver gave the plaintiff a form DOC-73, "Offender's Request for Attendance of Witness." The plaintiff used the form DOC-73 to request Conrad Reedy ("Reedy"), the KMCI Librarian, as a witness at the disciplinary hearing. Additionally, the plaintiff submitted a question for Reedy on a "Staff Witness Questionnaire," which he intended to be relied upon at the disciplinary hearing. Schueler did not deny the plaintiff's request for a witness statement by Reedy, and Reedy printed his response to the questionnaire, which was returned to Weaver.

The plaintiff also submitted questions for Captain Thiede, Lt. Casey, Lt. Zank, and Mr. Erdmeier. He asked the following question: "Did you inform Inmate O'Briecht that if he only wrote a particular party once and no contact was requested that he could not be disciplined unless he contacted that party after being ordered not to?" (Pucker Aff., Exhibit 1004, p. 7). Schueler reviewed the question and determined that it was not pertinent to the question of guilt or innocence as to the alleged rule violations in the Conduct Report. Schueler was aware that the plaintiff received notices from

Lt. Zank, Lt. Casey, Captain Thiede, Lt. Staehler, and Captain Buteyn that the institution had received complaints from various individuals that the plaintiff had written or telephoned. The intent of the notices was to order the plaintiff not to communicate with those individuals and to alert the plaintiff that failure to comply with the order would result in disciplinary action. Schueler did not think the plaintiff's question was pertinent because the plaintiff did not receive a Conduct Report because he violated the unwanted correspondence notices that he received from various staff or supervisors.

Defendants Captain Thiede, Lt. Casey, and Mr. Erdmeier say they were not requested to be present at the disciplinary hearing as witnesses, but the plaintiff says he requested them and Schueler denied them. The plaintiff sought them as witnesses because they told the plaintiff he could not be disciplined for sending unsolicited pen pal requests to individuals in the community.

The plaintiff also asked Weaver to assist him with obtaining outside witnesses who were neither KMCI staff nor other inmates. Weaver advised the plaintiff that the hearing officer makes the determination on contacting outside witnesses. Weaver could have contacted the outside witnesses, taken account of their testimony, and reported back to the hearing officer.

Wisconsin Administrative Code DOC 303.81 allows for witnesses other than inmates and staff. Typically, that would include employees and school officials who are involved in work and study release. Schueler would not have approved members of the community who had received the plaintiff's letters to come into the institution for the purpose of being a witness at his disciplinary hearing. To do so could have facilitated harassment by the inmate and created further tension within the community, and specifically the members of the community who received letters from the

plaintiff. In addition, the plaintiff was free to submit any written correspondence from these individuals that he thought relevant to the hearing officer.

Schueler did not act in concert with any other staff, nor did he take any joint action with any other staff to purposefully violate the plaintiff's right to have witnesses at his disciplinary hearing. At no time did Schueler discuss with anyone, including any of the named defendants, any prior offender complaints filed by the plaintiff as a basis for his decision related to witnesses. He was not aware of any such complaints and, as such, they were not a factor in his decision regarding the plaintiff's requests for witnesses.

At no time did Weaver discuss with anyone, including any of the named defendants, any prior offender complaints filed by the plaintiff as a basis for her actions as an advocate.

2.4    Plaintiff's Disciplinary Hearing

The plaintiff's disciplinary hearing was on June 20, 2007. Defendant Captain Galligan presided over the hearing. He was not personally involved in writing the Conduct Report or the investigation that led to issuing a Conduct Report to the plaintiff. Additionally, Captain Galligan did not determine whether requested witnesses should be present at the disciplinary hearing or could present a written statement at the hearing.

The plaintiff requested that Captain Galligan postpone the hearing to allow time for obtaining outside witness testimony. The plaintiff explained that the witnesses were highly relevant because they were the recipients of the form pen pal letters who the Conduct Report alleged were harmed, harassed, or intimidated. Captain Galligan refused to postpone the hearing to allow contact with outside witnesses; he only heard testimony from witnesses approved for the hearing by the Security Director.

At the hearing, the plaintiff told Captain Galligan that he wanted to question the people involved but was denied, including persons in the community to whom he had written correspondence. Pursuant to Wisconsin Administrative Code DOC 303.81(8), witnesses other than the inmate or staff may not attend hearings. However, with the hearing officer's permission, advocates may contact such witnesses. The adjustment committee may designate a staff member to interview any such witness and report to the committee.

Captain Galligan wrote the following decision on the Disciplinary Hearing form, DOC-84:

> Hearing Officer finds it more likely than not that this inmate O'Briecht committed the act of misuse of state or federal property, and Unauthorized use of the mail as he sent numerous letters to minor females in an attempt to entice them into corresponding with him. Numerous parents complained to this institution regarding inmate O'Briecht actions. Hearing Officer notes that staff did say they allow workers to do it however inmates are not to do personal work while at work. Hearing Officer evaluated all the evidence and reached its conclusion that the statements in the conduct report are correct. hearing Officer finds the conduct report to be credible, since the staff member writting [sic] the report has no reason to fabricate the information set forth. Hearing Officer finds the inmates statement to be less credible since it appears to be self-serving and an attempt to avoid disciplinary action. Hearing Officer notes that a staff advocate was assigned and that there is no known conflict of interest. Staff advocate was present during hearing.

(Affidavit of Hayley Pucker, Exhibit 1004, p. 3.). The plaintiff received a copy of this decision on June 20, 2007.

Captain Galligan averred that his decision on the Conduct Report was based solely upon the disciplinary rules set forth in Wisconsin

Administrative Code Chapter DOC 303 and after consideration of all relevant information. Captain Galligan further averred that he did not act in concert with any other staff or take any joint action with any other staff in determining his finding of guilty on the Conduct Report.

Although the plaintiff was sentenced to 180 days of disciplinary separation, he spent only a total of 78 days in that status. When he was transferred to Waupun Correctional Institution (Waupun) on September 6, 2007, the plaintiff was placed in involuntary unassigned status and was no longer in disciplinary separation status.

### 2.5 Plaintiff's Appeal and Offender Complaint Regarding Discipline

Any time within 10 days after a due process hearing or after the inmate receives a copy of the decision, whichever is later, the inmate has the right to appeal the decision and/or sentence to the warden. The purpose of the appeal is to ensure uniformity in decision-making at disciplinary hearings, to reduce or eliminate abuses of discretion, and to provide the warden with an opportunity to review the work of subordinates in handling the disciplinary process.

On June 21, 2007, the KMCI warden's office received a form DOC-91, "Appeal of Adjustment Committee or Hearing Officer's Decision," signed by the plaintiff. The plaintiff appealed the findings of guilt and the disposition, which consisted of 180 days of disciplinary separation. The plaintiff also included a two-page letter with his appeal.

Warden Jenkins conducted a review of all records and forms related to the Conduct Report and the disciplinary hearing to determine whether they were supported by sufficient evidence. Based on his review of the records, Warden Jenkins affirmed the hearing officer's decision and sentence

on June 29, 2007. Warden Jenkins found there was no basis for changing the guilty ruling or the sentence imposed by the hearing officer. Warden Jenkins believed the Conduct Report was credible and found that the hearing officer's decision on both guilt and disposition was supported by the record.

On July 3, 2007, the plaintiff filed an offender complaint that was assigned Complaint Number KMCI-2007-19364. In his offender complaint, the plaintiff suggested procedural errors in the Conduct Report related to the disciplinary hearing held on June 20, 2007. In processing this complaint, ICE Pucker was limited to a review on the record. Pucker conducted a review of the record related to the Conduct Report. She avers that she believed the Conduct Report and its allegations to be accurate and credible.

It is not within the authority of the ICE to review the sufficiency of the evidence on a conduct report. A finding of guilt and/or a review the evidence used to sustain a finding of guilt on a conduct report are outside the scope of the ICRS. Wis. Admin. Code DOC § 310.08.

Pucker found two procedural deficiencies regarding the plaintiff's discipline for the Conduct Report. These deficiencies included an inaccurate statement that Obriecht had previously been found guilty of the same offense, and that a prior conduct report had not been properly expunged from his records. On July 3, 2007, Pucker recommended that KMCI-2007-19364 be affirmed with these modifications, and her recommendation was sent to the Appropriate Reviewing Authority, Warden Jenkins. Warden Jenkins reviewed Pucker's recommendations and dismissed the complaint with Pucker's recommended modifications.

On July 9, 2007, the CCE Office received an appeal from the plaintiff related to KMCI-2007-19364. CCE Gozinske determined that Pucker had reasonably and appropriately addressed the issues raised by the plaintiff. He

believed that the records provided by KMCI and relied upon by Pucker were true, accurate, and credible: he found no procedural errors in the plaintiff's disciplinary hearing.

On August 7, 2007, Deputy Secretary Raemisch dismissed KMCI-2007-19364. He believed that the recommendations made by the CCE were appropriate and reasonable, and he believed the records provided by KMCI and relied upon by the ICE and CCE to be true, accurate and credible. Raemisch found no procedural errors in the plaintiff's disciplinary hearing.

In their respective roles, defendants Pucker, Warden Jenkins, Gozinske, and Raemisch each reviewed numerous conduct reports and/or offender complaints. Each of these defendants has averred that he or she did not act in concert with any other staff, nor take any joint action with other staff, to purposefully violate the inmate's right to appeal the decision and sentence related to the Conduct Report.

2.6     Program Review Committee Decision

Based on the disposition of 180 days of disciplinary separation imposed, Captain Galligan referred the plaintiff to the Program Review Committee (PRC) for review of custody.

When inmates are given disciplinary separation or program segregation, they are automatically removed from their current work, school, and programming assignments and assigned to the applicable disciplinary status. The PRC does not have any involvement in an inmate's work assignments.

Each PRC is responsible for reviewing and then making recommendations regarding inmates' custody classification. The PRC's recommendations do not become final without the approval of the DOC Director of the Bureau of Offender Classification and Movement (or the

director's designee). Program review is an ongoing process of monitoring custody classification, institution placement, and program or treatment assignments. Wis. Admin. Code. DOC 302.17.

Before an inmate at KMCI is scheduled to see the PRC, defendant Rosie Eickhoff and the inmate's social worker investigate and document the inmate's adjustment and conduct, program or treatment assignments, and other relevant factors to make a determination of the inmate's progress and accomplishments.

At the PRC hearing, the PRC informs the inmate of the purpose of the review and reads through the inmate's case, which includes, but is not limited to, release dates, parole eligibility status, the date the inmate was admitted to prison, the inmate's offense and offense dynamics, violations, detainers, pending charges, jail conduct, institution adjustment and conduct reports, special placement needs, clinical, medical/dental needs, any program needs, the inmate's risk assessment, the inmate's comments to his social worker, and the social worker's recommendations. The inmate verifies whether this information is correct. If there are concerns about anything, they are investigated before continuing. In addition, the inmate may present further information and state an opinion about the custody classification, program or treatment assignment, or institution placement.

The purpose of custody classification is to determine the appropriate placement of an inmate in order to regulate the supervision and movement of inmates among institutions, and between institutions and community programs. There are many factors the PRC considers when determining custody classification, including violations of inmate disciplinary rules under DOC 303. Inmates were classified under one of the five custody classification

levels based upon the result of an assessment of the inmate's risk under the Assessment and Evaluation process or the Program Review process.

A maximum custody classification provides the inmate with close monitoring of inmate conduct, behavior, and activities. Inmates may be placed in maximum custody status for a number of reasons. In addition, some inmates who are placed or retained in maximum custody status due to significant misconduct within the institution are sent to other maximum security facilities as an additional measure to address and correct their behavior.

The PRC's recommendations for custody or transfer require the approval of the Director of the Bureau of Offender Classification and Movement (or the director's designee). An inmate may appeal custody classification, transfer, institution placement, and program or treatment assignment to the director within 30 days of the inmate's receipt of the written decision.

The plaintiff's PRC hearing proceeded on July 18, 2007. The members of the PRC were defendants Eickhoff, Bloczynski, Keberlein, and Capt. Haferman. The plaintiff was present for the hearing and informed the PRC that the Conduct Report was written in retaliation for the plaintiff exercising his First Amendment right to file offender complaints with the ICRS. The plaintiff asked the PRC to postpone the hearing to look into his objections, but they denied that request.

The PRC recommended maximum custody with transfer to any maximum custody institution with a twelve month recall. This recommendation was based upon the recommendation provided by the unit social worker who had interviewed the plaintiff prior to the program review hearing. It was also based on the plaintiff's marginal conduct during his

incarceration, including the most recent Conduct Report related to him sending letters to females requesting that they write to him in prison. The plaintiff obtained names and addresses of females and was writing to them soliciting for pen pals while working as a library clerk.

The members of the PRC believed that the offenses related to the plaintiff's finding of guilt as to misusing state property and writing letters to females were serious offenses. They were also concerned that the plaintiff did not feel he was doing anything inappropriate. The PRC members followed the recommendations of a social worker who is not a defendant in this case. The social worker noted in her recommendation, among other things, that the plaintiff was on the waiting list for sex offender treatment and that one of his criminal convictions resulted from the plaintiff attempting to engage in sexual contact with a female minor in a girls' bathroom stall at a high school.

At no time did the defendant members of the PRC act in concert with any other staff or take any joint action with any other staff to deprive the plaintiff of his rights related to the program review procedures or the recommendations made by the committee. At no time did they discuss with anyone, including any of the named defendants in this action, any prior complaints filed by the plaintiff as a basis for the recommendations they made at the program review hearing on July 18, 2007.

2.7    Parole Commission Decision

On November 5, 2007, defendant Jayne Hackbarth ("Hackbarth"), a Parole Commissioner, met with the plaintiff and conducted a parole interview. The purpose of her interview was to consider the appropriateness of recommending parole status for the plaintiff. The plaintiff explained to

Hackbarth that the Conduct Report was the product of a violation of the plaintiff's constitutional rights.

Based on her interview, Hackbarth recommended that the plaintiff not be granted parole. She included her recommendations on a form DOC-1208:

> Since the time of your last parole interview you had some difficulties with conduct and now are in a maximum security facility. Your recent infractions are that you wrote letters from prison to young girls who had recently graduated. These were strangers to you and you indicated your motivation was to solicit a pen pal as you get lonely in prison. You obtained their names, addresses and ages from periodicals available to you from your job as a clerk in the library. You were found to have lists containing information on these females. This resulted in parents and young women contacting the institution to complain. You are seeking legal relief from this conduct report but as of now there has been no legal action. I do take this matter seriously and it is a factor in my decision today. You are in prison for the first time and this is a result of you violating probation and continuing to engage in illegal behavior. You are serving a sentence of little over 18 years for Attempted 2nd Degree Sexual Assault, Disorderly Conduct, 5 counts of 4th Degree Sexual Assault, Escape and Battery. The attempted sexual assault involved you bursting into a stall in the women's bathroom that was being used by a 16 year old girl, making inappropriate comments to her and touching her on the leg. Other behaviors that resulted in charges involved being in a girl's locker room at a high school and making inappropriate sexual remarks to a young girl and other episodes of sexual touching and making unwanted advances to both strangers and girls whom were known to you. Initially you were on probation and other matters were disposed of by prison time but you appealed and were out on bond. You failed to comply with the rules by absconding, leaving the state and being involved in other criminal behavior. You ended up with a battery charge that occurred while you were later at a county jail facility and also had an escape charge for not complying with the Huber requirements, which apparently was part of a formal ATR. While on a previous, unrelated

probation you were revoked for several violations that included you being at an elementary school, telling a 10 year old girl her mother was outside, then offering her a ride home when this turned out to not be the case. The girl fled back into the school. Apparently there was also contact with other minor children involving offering to gave them rides. You have some very disturbing and scary offenses on your record and it does not appear you fully realize the seriousness of your situation. At this time confinement is very well justified to address the issue of punishment, so as not to depreciate the seriousness of your actions and to protect others from your criminality for as long as possible. You are in need of AODA-5D and SO-2 and entry into programming as soon as possible is endorsed to assure that you get treatment in order to try and reduce the risk you present to others.

(Affidavit of Karen Hardiman-Bell, Exhibit 1005).

On November 9, 2007, defendant Alfonso Graham ("Graham") reviewed Hackbarth's recommendations and approved the recommendation that the plaintiff should remain incarcerated and not be granted parole. Graham made the decision to deny parole based on his belief that the plaintiff had not served sufficient time for punishment of the crimes for which he was convicted and his belief that the plaintiff's institution adjustment (conduct record) and program participation had not been satisfactory. Graham also believed that the plaintiff's release would involve an unreasonable risk to the public.

Hackbarth and Graham did not base their recommendation and decision regarding the plaintiff's parole on any prior complaints he filed through the ICRS. Nor did they discuss with anyone, including any of the named defendants in this action, any prior complaints or lawsuits filed by the plaintiff as a basis for their recommendation or decision to deny parole.

Decisions of the parole commission were not subject to the ICRS, and there was no administrative appeal of parole commission decisions.

3.  DISCUSSION

    3.1  Plaintiff's Motion for Summary Judgment.

        On April 3, 2012, the plaintiff filed a motion asking for summary judgment on his retaliation, procedural and substantive due process, and conspiracy claims.

        With regard to his retaliation claim, the plaintiff asserts that: (1) he was exercising his constitutionally protected right when he submitted complaints to the ICRS concerning prison conditions; (2) prison officials took adverse action against him for filing those offender comments; and (3) the adverse action was motivated at least in part by his constitutionally protected activity, the filing of the offender complaints.

        The plaintiff argues that there is undisputable proof that plaintiff had permission to use the typewriter and that the form letter the plaintiff sent was not intimidating, harassing, or harmful, but the defendants were motivated by the plaintiff's protected activity to punish him. He says that the motive is further evidenced by the timing of the events–the defendants' adverse actions were taken in the midst of the plaintiff's protected activity. Also in support of his retaliation claim, the plaintiff argues that he received disparate treatment and that offenders generally would not be sent to maximum security for using a typewriter and the mail without authorization. He concludes that there is no other explanation for the defendants' actions, other than his protected activity.

        The plaintiff also argues that the defendants violated his substantive due process rights by issuing and upholding a conduct report in retaliation

for exercising his protected First Amendment right to file offender complaints.

Next, the plaintiff argues that his procedural due process rights were violated when: (1) he was denied staff and outside witnesses without constitutionally acceptable reasons; (2) he was found guilty of conduct without any evidence; (3) the defendants condoned and approved of a Conduct Report that was clearly false; (4) the defendants elevated the plaintiff's custody level based on a clearly false report; and (5) the defendants denied the plaintiff's parole based on a clearly false report.

Finally, the plaintiff argues that he is entitled to summary judgment on his claims that the defendants conspired to violate his rights to due process in the disciplinary process and his First Amendment right to file grievance without retaliation. He makes the conclusory statement that they knew the objective to wrong the plaintiff and the previously critiqued evidence is adequate proof of the plan to hurt the plaintiff.

The court will consider the plaintiff's arguments and whether he is entitled to summary judgment in conjunction with the defendants' motion.

3.2    Defendants' Motion for Summary Judgment.

The defendants filed their motion for summary judgment on May 1, 2012. They argue that they are entitled to summary judgment because: (1) there is no evidence that the plaintiff's three prior ICRS complaints were a motivating factor behind the disciplinary proceedings, transfer, and denial of parole; (2) the plaintiff's substantive due process claim is redundant of his First Amendment retaliation claim; (3) all of the defendants are DOC employees and cannot be part of a conspiracy due to the intracorporate conspiracy doctrine; (4) the plaintiff has no protected liberty interest and received all of the process due him in the disciplinary hearing; (5) the plaintiff

is not entitled to compensatory or punitive damages pursuant to 1997e(e); and (6) the defendants are entitled to qualified immunity. The defendants' arguments, and the plaintiff's arguments in response will be discussed thoroughly below.

### 3.2.1 Retaliation

To establish a prima facie case of retaliation, an inmate must produce evidence that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *Kidwell v. Eisenhaur*, 679 F.3d 957, 965 (7th Cir. 2012). If the inmate satisfies these elements, the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *Id.* at 965.

First, grieving about prison conditions is a protected First Amendment activity. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). The defendants do not dispute this, and this element of the prima facie case is satisfied.

Second, the court will assume for the purposes of summary judgment that a Conduct Report with a disposition of guilty and a sentence of 180 days of disciplinary separation, along with a transfer to a maximum security institution, and a denial of parole, are deprivations likely to deter protected speech.

The parties' substantive arguments relate to the third element, whether the plaintiff's protected speech (the offender complaints) was a motivating factor in the defendants' actions.

As an initial matter, a number of the defendants argue that they were not personally involved in any constitutional deprivation. This includes defendants Galligan, Zank, Schueler, Haferman, Keberlein, Bloczynski,

Erdmeier, Casey,[2] Thiede, Graham, Hackbarth, Eickhoff, and Weaver. They each aver that they had no prior knowledge of the plaintiff's offender complaints with the ICRS and, therefore, their actions related to the Conduct Report could not have been in retaliation for the plaintiff filing those offender complaints.

The plaintiff argues that these affidavits should not be considered because they are self-serving and, as a result, there is no evidence in support of the defendants' motion for summary judgment as to these defendants. First and foremost, an affidavit is evidence. *Lax v. City of South Bend*, 449 F.3d 773, 774 (7th Cir. 2006). Although some affidavits can be considered self-serving, the court may not strike affidavits as self-serving where the affidavits are based on personal knowledge. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F.Supp.2d 856, 869 (N.D.Ill. 2010). These defendants know whether they were aware of plaintiff's offender complaints and, because they were not, they are entitled to summary judgment on the plaintiff's retaliation claim.

The only defendants remaining are Pucker, Jenkins, Gozinske, and Raemisch, who knew about the plaintiff's offender complaints because they were each part of the ICRS review of those complaints. None of these defendants were involved in investigating or preparing the Conduct Report, conducting the plaintiff's disciplinary hearing, the PRC determination regarding the plaintiff's custody classification, or the parole decision. Thus, there is no evidence in the record that any of these defendants were involved in any adverse action taken against the plaintiff, let alone an adverse action

---

[2] In his response to the defendants' motion for summary judgment, the plaintiff asks to voluntarily dismiss defendant Casey. The court will consider the plaintiff to have conceded summary judgment as to defendant Casey.

with the plaintiff's offender complaints as a motivating factor. These defendants are also entitled to summary judgment on the plaintiff's retaliation claim. Because each of the defendants is entitled to summary judgment, the plaintiff's motion for summary judgment will be denied.

### 3.2.2 Conspiracy

"To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participant(s) in joint activity with the State or its agents." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). However, conspiracy is not an independent basis of liability in § 1983 actions. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (citing *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)). Because the court granted the defendants' motion for summary judgment regarding the plaintiff's retaliation claim, the defendants are entitled to the same result on his conspiracy claim.

### 3.2.3 Substantive Due Process

The plaintiff characterizes his substantive due process claim as a claim against the defendants for issuing and upholding a Conduct Report in retaliation for him exercising his protected First Amendment right to file offender complaints. The defendants argue that this claim is duplicative of the retaliation claim. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (quotations omitted). More specifically, a substantive due process claim may not be maintained when a specific constitutional provision

(in this case the First Amendment) protects the rights allegedly violated. *U.S. v. Lanier*, 520 U.S. 259, 272 (1997). Substantive due process analysis is inappropriate if the plaintiff's claim is "covered by" the First Amendment, *see County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998), and, in this case, the claim is covered. The defendants are entitled to summary judgment on this claim, and the plaintiff's motion for summary judgment will be denied.

### 3.2.4 Procedural Due Process

The plaintiff argues that his procedural due process rights were violated when: (1) he was denied staff and outside witnesses without constitutionally acceptable reasons; (2) he was found guilty of conduct without any evidence; (3) the defendants condoned and approved of a Conduct Report that was clearly false; (4) the defendants elevated the plaintiff's custody level based on a clearly false report; and (5) the defendants denied the plaintiff's parole based on a clearly false report.

"A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934 (7th Cir. 2007) (citations omitted). A liberty interest exists when prison officials restrain the freedom of inmates in a manner that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). However, discipline in segregated confinement does not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. *Id.* at 485; *see also Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1998) (prison inmate's 70-day confinement in disciplinary segregation was not "atypical and significant" deprivation of prisoner's liberty and thus

did not implicate liberty interest protected under due process clause; prisoner has no liberty interest in remaining in the general prison population); *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (90 days).

In *Marion v. Columbia Correctional Institution*, 559 F.3d 693 (7th Cir. 2009), the Seventh Circuit discussed the limited interest a prisoner has in avoiding disciplinary segregation and summarized its prior holdings on the issue. The court "noted that six months of segregation is 'not such an extreme term' and, standing alone, would not trigger due process rights." *Id.* at 698 (quoting *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995)). In this case, the plaintiff was sentenced to 180 days of disciplinary separation, but only served 78 days before being transferred and placed in the general population at his new institution. Additionally, the plaintiff has made no complaints about the conditions of disciplinary segregation at KMCI and has presented no evidence of conditions that would suggest a liberty interest had been infringed. The plaintiff did not have a protected liberty interest in the disciplinary hearing. His motion for summary judgment on this claim will be denied, and the defendants' motion for summary judgment will be granted.

### 3.2.5   Additional Matters

Due to the resolution of the plaintiff's claims above, the court need not address whether he would have been entitled to compensatory or punitive damages or whether the defendants were entitled to qualified immunity.

### 3.2.6   John Does and Jane Does

Finally, the plaintiff was allowed at screening to proceed against John Does and Jane Does. However, he never identified these individuals or served them with the complaint. They will be dismissed with prejudice.

Accordingly,

IT IS ORDERED that the plaintiff's motion for leave to file (Docket #86) be and the same is hereby GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that the Jane Does and John Does named in the plaintiff's complaint be and the same are hereby DISMISSED with prejudice;

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment (Docket #55) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #59) be and the same is hereby GRANTED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2013.

BY THE COURT:

J.P. Stoltmueller
U.S. District Judge